IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 2:10cr186-MHT |
| MILTON E. McGREGOR, | ) | (WO) |
| THOMAS E. COKER, | ) | |
| LARRY P. MEANS, | ) | |
| JAMES E. PREUITT, | ) | |
| HARRI ANNE H. SMITH, | ) | |
| JARRELL W. WALKER, JR., | ) | |
| and JOSEPH R. CROSBY | ) | |

<u>OPINION AND ORDER</u>

Shortly before the retrial in this public-corruption
case, the government informed the defendants that it had
failed to disclose certain potentially exculpatory
evidence prior to the first trial.  In response to this
revelation, defendant Milton E. McGregor contends that
the government has violated the principle established in
<u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and he moves for
the dismissal of certain counts.  For the reasons that
follow, McGregor's motion will be denied.

## I.  BACKGROUND

The government alleges that the defendants participated in a sweeping conspiracy to buy and sell votes of Alabama lawmakers.  The ultimate objective was to secure passage of Senate Bill 380 ("SB380"), which would have authorized a constitutional referendum on whether to legalize electronic bingo.[1]

The first trial began in early June 2010 and lasted for ten weeks.  The jury returned 91 not-guilty verdicts and deadlocked on 33 counts.  The retrial is scheduled to begin on January 30, 2012.  While this case still involves seven defendants, the alleged Brady violation pertains to a specific allegation of bribery between two defendants.

――――――――――

1.  Given the numerous opinions already issued in this case, the court assumes a certain familiarity with the facts.  For a thorough discussion of this litigation, see United States v. McGregor, ___ F. Supp. 2d ___, 2011 WL 5025835 (M.D. Ala. Oct. 20, 2011).

Counts 15 and 16 of the indictment charge that McGregor, the owner of a prominent gaming establishment in Macon County, Alabama, bribed defendant Joseph R. Crosby, a legislative analyst with the Alabama Legislative Reference Service ("LRS"). Specifically, the government contends that McGregor made monthly payments of $ 3,000 to Crosby in return for Crosby's crafting of statutory language in drafts of SB380 that was helpful to McGregor's interests.

The Brady material concerns a hotly contested issue at the first trial: whether McGregor's discussions with Crosby were "proper" or "authorized." The debate boiled down to whether a contact authorized by LRS rules was necessarily a proper contact. To take just one example: during closing arguments, the government played a recorded phone call between McGregor and Crosby where they discuss the merits of SB380 and McGregor asks Crosby not to mention the call to Senator Roger Bedford, a prominent leader on gambling legislation. The defendants

3

argued that Bedford authorized LRS staff to discuss SB380
with McGregor because of his extensive knowledge of the
Alabama gambling industry.  The government retorted that
while the McGregor-Crosby contact may have been
authorized, it was nevertheless improper because of the
bribe payments.

Three weeks before the retrial, the government
emailed defense counsel to notify them of certain
undisclosed information that supported the defendants'
theory of authorization.  According to the government's
email, LRS director Jerry Bassett informed the government
that:

> ● Crosby told Bassett that McGregor was
> authorized to interact with Crosby on
> behalf of Senator Bedford with respect
> to SB380;
>
> ● Bassett believed that Bedford
> authorized McGregor to interact with
> Crosby on behalf of Bedford with respect
> to SB380;
>
> ● Bassett believed that the telephone
> conversation between Crosby and McGregor
> was proper if McGregor had been

authorized as a legislative proxy who
could interact with Crosby; and

• Bassett did not believe there was
anything improper with McGregor
instructing Crosby to start making
changes to SB380 without telling Bedford
that McGregor and Crosby had spoke.

Additionally, LRS employee Helen Hanby told the

government that:

• The procedure by which legislators
authorized proxies to interact with LRS
analysts could be informal and
unwritten;

• Hanby expected any LRS employees
receiving income from outside LRS to
disclose the outside income to the LRS;
and

• Hanby was aware of instances in which
income had not been disclosed but those
instances involved things such as
holiday work (for example, making extra
money through gift wrapping).

Gov't Email (Doc. No. 2130-1).

In subsequent emails, the government explained that

this information was obtained in May or June 2010 during

preparation sessions for the first trial.  The sessions

were attended by a prosecutor, an FBI agent, and the

witness.  According to the government, the sessions were not memorialized verbatim, but attorney notes were generated afterwards.  Gov't Reply Email (Doc. No. 2130-3).

After McGregor filed his <u>Brady</u> motion, the government submitted three exhibits: Bassett's grand jury testimony, Hanby's grand jury testimony, and Crosby's "302 Report" from his interview with the FBI.  The government contends that these documents, which were disclosed prior to the first trial, satisfy its <u>Brady</u> obligations.

By way of telephone, the court held a hearing on McGregor's <u>Brady</u> motion.  Because all the relevant evidence is now before the court, there does not appear to be any need for an <u>in</u> <u>camera</u> inspection of the government's files.  <u>See</u> <u>United States v. Valera</u>, 845 F.2d 923, 927 (11th Cir. 1988) ("Occasionally, it is appropriate for judges to examine personally government files to satisfy <u>Brady</u>....  Generally, however, trial

judges are not required to examine personally government files.").

## II.  STANDARD FOR <u>BRADY</u> VIOLATIONS

In <u>Brady</u>, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  "Evidence 'favorable to an accused' includes both impeachment evidence and exculpatory evidence." <u>Jennings v. McDonough</u>, 490 F.3d 1230, 1236 (11th Cir. 2007).

To establish a <u>Brady</u> violation, a defendant must prove: "(1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed

the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different." United States v. Meros, 866 F.2d 1304, 1308 (11th Cir. 1989) (per curiam) (internal citations omitted).

Of critical importance here is the concept of "reasonable diligence." "Where defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged Brady material, there is no suppression by the government." United States v. Griggs, 713 F.2d 672, 674 (11th Cir. 1983) (per curiam). In other words, a defendant has no Brady claim if, after being put on notice of potentially exculpatory material, he fails to exercise reasonable diligence in pursuing the lede.

### III.   ANALYSIS

McGregor submits that the Brady material prejudiced his case by permitting the government to insinuate that communications between himself and Crosby were unauthorized and improper.[2]   As a remedy, McGregor requests the dismissal of counts 15 and 16: the McGregor-Crosby bribery counts.

The government responds that there is no Brady violation because either (1) the information was disclosed to the defendants in another form; or (2) the defendants were on notice concerning the exculpatory evidence and failed to exercise reasonable diligence.

---

2. McGregor's motion does not address whether Hanby's comments regarding financial disclosure and outside payments were exculpatory or that their suppression was prejudicial. Although defense counsel hinted at this issue during an on-the-record conference call, the court rejects any contention that Hanby's financial disclosure comments were exculpatory evidence. Hanby reinforced the government's argument that Crosby should have reported the $ 3,000 monthly payments to McGregor. Furthermore, her remarks about other employees' failing to disclose outside funding for wrapping gifts is too distinct from the alleged bribery to exculpate Crosby or McGregor.

The court will address each disclosure in turn.

A.   Informal Authorization

During the first trial, McGregor and Crosby argued to the jury that "a sponsor's authorization of an outside person to work with LRS staff could be informal and unwritten."  McGregor's Brief (Doc. No. 2130) at 6. McGregor submits that Hanby's comments would have supported this argument and foreclosed the government from implying that McGregor's calls to Crosby were improper.

The government points out that similar evidence was disclosed to the defendants prior to the first trial. In front of the grand jury, Hanby explained that deviations from the formal authorization procedures were permitted. Hanby Testimony (Doc. No. 2141-1) at 8 ("On the form--the member of the Legislature can bring us the form filled out.  We'll even take it over the phone. The member can call and say, I authorize this person to talk to you

10

about this bill."); <u>see also</u> Bassett Testimony (Doc. No. 2141-2) at 42 ("[T]he oral authorizations, if they're only for a particular project, would be annotated on that project.   Now, a member may authorize someone on a permanent basis to work for them on it orally, in which case, then it would be put on the list; but if it's only work with this particular individual on this particular bill, there would not--we would not put them on the permanent list because they're not authorized permanently.").   Because defendants possessed this evidence, there was no <u>Brady</u> violation.


      B.  Bassett's Interpretation of the McGregor-Crosby
          Phone Conversation

As described above, the government closed by playing portions of a recorded call between McGregor and Crosby where they discuss the merits of SB380 and McGregor asks Crosby not to mention the call to Bedford.   The government asserted that this call revealed a corrupt connection between McGregor and Crosby.   McGregor

believes that the <u>Brady</u> material prejudiced him because Bassett could have testified that the conversation, in its entirety, was proper.

Once again, the grand jury testimony reveals the alleged <u>Brady</u> material.   After playing the same wiretapped call, the government asked Bassett: "[I]s there anything that you heard during that conversation, any part of the conversation or any of the subject matter of the conversation that disturbs you or bothers you or worries you about the conduct of Mr. Crosby's behavior exemplified there, in your capacity as executive director of the Legislative Reference Service?"   <u>Id</u>. at 57. Bassett responded "no" and explained that everything in the call "went by the book" if Bedford had authorized McGregor to speak with LRS staff.   <u>Id</u>.

Thus, the government provided evidence that Bassett viewed the McGregor-Crosby call as proper.[3]

_____

3.   McGregor also submits that the government mislead the court and jury on the authorization issue.  McGregor places    particular    emphasis    on    the    government's

(continued...)

C.  McGregor's Authorization

McGregor's  final  contentions  are  interrelated.
McGregor claims that the government improperly suppressed
evidence  that  (1)  Crosby  told  Bassett  that  McGregor  was
authorized  and  (2)  Bassett  believed  that  McGregor  was
authorized.

The  government  responds  to  the  first  contention  by
pointing  to  Crosby's  302  Report.    During  his  interview
with  the  FBI,  Crosby  explained  his  relationship  with
McGregor and David Johnston, a McGregor ally.  Crosby had
been  instructed  by  Bedford  to  work  with  McGregor  and
Johnston on the legislation.  Crosby 302 Report (Doc. No.
2141-3)  at  3.    Crosby  further  claimed  that  "Senator

_____

(...continued)
interpretation of the McGregor-Crosby call during closing
argument.  The court has reviewed the relevant transcript
and  concludes  that  the  government  was  implying  the  call
was improper because of the $ 3,000 monthly payments, not
because  it  was  unauthorized  under  LRS  rules.    And,  in  any
event,  the  government  is  not  required  to  credit  or  adopt
Bassett's  interpretation  of  the  call.

13

Bedford ha[d] told [him] to give McGregor whatever he wants." Id. at 4.

As to the second point, the government acknowledges that Bassett's belief about McGregor's authorization was not disclosed. Nevertheless, the government believes that Bassett's grand jury testimony put the defendants on notice of this potentially exculpatory evidence. During his grand jury appearance, Bassett testified that "I believe that Milton--I believe that I know one way or the other whether or not Mr. McGregor has been authorized to work with us." Bassett Testimony (Doc. No. 2141-2) at 55. Bassett declined to express his belief, citing legislative privilege. Id.

The government's suppression argument as to the first point goes too far. Evidence that Crosby claimed to have told Bassett about McGregor's authorization is distinct from Bassett's confirmation of that assertion. McGregor's Brady argument, however, must fail on "reasonable diligence" grounds.

14

Through the combination of Crosby's 302 Report and Bassett's grand jury testimony, the defendants were on notice about this evidence.  The defendants were free to interview Bassett to confirm whether Crosby's 302 Report was credible.  Moreover, Bassett's grand jury testimony expressly indicates that he had developed an opinion regarding McGregor's authorization.  As the defendants conceded during an on-the-record conference call, they were aware that Bassett subsequently complied with a court order to provide previously privileged materials.  Reasonable diligence could have uncovered Bassett's opinions on this subject and, therefore, McGregor cannot claim a <u>Brady</u> violation.  <u>See</u> <u>Jennings</u>, 490 F.3d at 1238-39 (holding that defendant failed to exercise reasonable diligence when he had personal knowledge of a potential witness from the night of the crime and "clearly was aware of the import and tenor of the [witness's] taped [statement] from other sources").

15

D.  Remedy

Finally, even assuming that the government violated Brady, the court would not order the dismissal of counts 15 and 16.  The Supreme Court has not directly decided when, if ever, dismissal with prejudice is a remedy for a Brady violation.  Virgin Islands v. Fahie, 419 F.3d 249, 252 (3d Cir. 2005).  Indeed, "[d]ismissal of an indictment with prejudice is the most severe sanction possible."  United States v. Isgro, 974 F.2d 1091, 1097 (9th Cir. 1992).  Given the harshness of this remedy, courts have indicated that factors such as recurring violations, willful misconduct, and prejudice are necessary preconditions for dismissal with prejudice. See Fahie, 419 F.3d at 253-55; United States v. Jones, 620 F. Supp. 2d 163, 185-93 (D. Mass. 2009) (Wolf, J.) (collecting cases); United States v. Dollar, 25 F. Supp. 2d 1320 (N.D. Ala. 1998) (Clemon, J.) (dismissing conspiracy indictment after government defied numerous court orders to provide Brady material).  Given the

16

absence of such factors in this case, the court declines to dismiss counts 15 and 16.[4]

* * *

To be clear, while the "better course" would have been for the prosecutors to have handed over the trial preparation session evidence before the first trial, Jennings, 490 F.3d at 1238, there is no Brady violation in this case. The government fulfilled its Brady obligations by providing the same information in the form of grand jury testimony  and putting the defendants on notice about Bassett's beliefs on the authorization issue.

_____

4.  In any event, the peculiar posture of this case provides a remedy.  Many Brady violations are discovered after a conviction and are remedied, if at all, on appeal or through a collateral attack.  By contrast here, the first trial has already ended and the alleged Brady violation was discovered in advance of the retrial. Because of this odd circumstance, the defendants would have a new trial regardless of any Brady violation.

17

Accordingly, it is ORDERED that defendant Milton E. McGregor's motion to compel, etc. (Doc. No. 2130) is denied.

DONE, this the 25th day of January, 2012.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE